# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| CURTIS THOMPSON, <br><br> Plaintiff, <br><br> v. <br><br> OFFICER BURACH, et al., <br><br> Defendants. | CASE NO. C05-02064JLR <br><br> FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This matter came for trial on December 14-16, 2011, before the court sitting without a jury.[1] Plaintiff Curtis Thompson appeared *pro se* from Clallam Bay Corrections Center. All defendants were represented by John W. Cobb of the King County Prosecuting Attorneys Office, Seattle, Washington. The court has considered the testimony presented at trial, the exhibits admitted into evidence, and the arguments of counsel. The court has weighed the testimony, exhibits, and other evidence using the

---

[1] Mr. Thompson waived his jury trial. (Dkt. # 163.)

required "preponderance of the evidence" standard. The court now makes the following findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

1. On two separate occasions employees of King County Department of Adult and Juvenile Detention used force on Mr. Thompson while he was incarcerated at the King County Jail. The first occurrence was on April 7, 2005 (the "April 7th Incident") and the second occurrence was on January 21, 2006 (the "January 21st Incident").

2. During both the April 7th Incident and the January 21st Incident, Mr. Thompson was an inmate at the King County Jail in Seattle, Washington. At the time of the April 7th Incident, Mr. Thompson was classified as a maximum security inmate. At the time of the January 21st Incident, Mr. Thompson was classified as an ultra security inmate.

3. During both the April 7th Incident and the January 21 Incident, Defendants correctional officer ("C/O") Richard Burach, C/O Phillip Chu, C/O Tara Eigo, Sergeant Bernice Ingersoll, C/O Mohamed Eltayeb, C/O Richard Gorman, and Sergeant Barclay Pierson were employed by the King County Department of Adult and Juvenile Detention.

<u>April 7th Incident</u>

4. On April 7, 2005, C/O's Burach and Chu were assigned to transport Mr. Thompson to a court hearing at the King County Courthouse. At about 2:30 pm C/O's Burach and Chu transported Mr. Thompson to a holding area on the 12th floor of the King County Courthouse for that hearing. Mr. Thompson was first placed in a side cell

and then transported to another cell, referred to as a "Barney Cell," so that he could speak to his attorneys prior to the court hearing.

5. During transfer to the holding area and into the Barney Cell, Mr. Thompson was cooperative.

6. Sergeant Ingersoll and C/O Eigo were working on the 12th floor of the King County Courthouse during the entire time Mr. Thompson was in the "Barney Cell."

7. Sergeant Ingersoll and C/O's Burach and Eigo were all aware of Mr. Thompson's history of violent behavior and C/O Chu had been briefed that Mr. Thompson was a dangerous person. Additionally, Mr. Thompson had previously threatened C/O Burach in the presence of C/O Eigo.

8. While in the Barney Cell, Mr. Thompson engaged in a heated conversation with his attorneys.

9. Before transporting Mr. Thompson to the court hearing from the Barney Cell, Sergeant Ingersoll instructed C/O's Burach and Chu to apply waist chains and leg irons to Mr. Thompson.

10. C/O's Burach and Chu entered the Barney Cell with C/O Chu holding the waist chains and leg irons and C/O Burach holding pepper spray.

11. At the time C/O's Burach and Chu entered the Barney Cell, C/O Eigo was standing by the dispatch door, which is near the Barney Cell, and could see into the Barney Cell. Sergeant Ingersoll was in the dispatch office.

12. When C/O's Burach and Chu entered the cell, Mr. Thompson engaged in a fighting stance and began hopping up and down and throwing punches.

13. In response to Mr. Thompson's actions, C/O Chu dropped the waist chains and leg irons and attempted to restrain Mr. Thompson by going behind him and wrapping his arms around him, but Mr. Thompson continued to struggle.

14. C/O Burach applied pepper spray to Mr. Thompson's face, but did not get a good shot of pepper spray, and Mr. Thompson continued to struggle. At this point, C/O Burach also engaged in the effort to physically restrain Mr. Thompson by attempting to handcuff him.

15. While C/O's Burach and Chu struggled with Mr. Thompson, C/O Eigo called into the dispatch office for back up and entered the Barney Cell to assist in the efforts to restrain Mr. Thompson.

16. In response to C/O Eigo's call into the dispatch office, Sergeant Ingersoll told one of the officers in the dispatch office to call for backup over the public address system. Sergeant Ingersoll then went to provide backup to the struggle between C/O's Burach, Chu, and Eigo and Mr. Thompson.

17. When Sergeant Ingersoll arrived, the officers were still struggling with Mr. Thompson. While the officers had been successful in applying leg restraints, they were attempting to handcuff Mr. Thompson, who was resisting against placing his arms behind his back and ignoring orders to do the same.

18. Soon additional officers arrived at the Barney Cell.

19. Sergeant Ingersoll applied pepper fog to Mr. Thompson. Pepper fog is designed to temporarily make breathing difficult when inhaled.

20. After application of the pepper fog, Mr. Thompson gasped and stated that he couldn't breathe. At this point, the officers were able to pull Mr. Thompson to the floor and apply handcuffs.

21. Mr. Thompson was then placed into a restraint chair, which is designed to make it difficult for a person sitting in it to stand up.

22. Once in the chair, a spit sock was placed over Mr. Thompson's head, because Mr. Thompson was spitting on the officers. It was also used to guard against Mr. Thompson biting any of the officers.

23. Mr. Thompson was transported back to jail where a registered nurse evaluated Mr. Thompson and determined that his lungs and heart were in excellent condition.

24. C/O Chu suffered exposure to pepper spray during the incident and C/O Burach suffered an injury to his hand. Additionally, numerous officers were treated for pepper spray exposure by the jail's medical staff.

25. C/O's Burach, Chu, and Eigo and Sergeant Ingersoll did not use excessive force against Mr. Thompson at any point during the struggle. While the use of pepper spray is an intermediate use of force, it was justified in the circumstances of the situation.

<u>January 21st Incident</u>

26. On January 21, 2006, Mr. Thompson was incarcerated at the King County Jail in Seattle, Washington.

27. At around 8:00 p.m., Sergeant Barclay Pierson instructed C/O's Mohamed Elteyab and Richard Gorman, along with other officers, to conduct a shakedown of the

ultra-security inmates in the housing wing where Mr. Thompson was then residing. A shakedown consists of removing the inmate from his/her cell and then searching his/her cell for contraband.

28. C/O's Eltayeb and Gorman were assigned to a team of two or more officers for the shakedown. Utilization of teams allowed some officers to stay with the inmate while other officers conducted a search of the inmate's cell.

29. In response to Sergeant Pierson's request, C/O's Eltayeb and Gorman, along with other members of their team, went to Mr. Thompson's cell to conduct the shakedown.

30. Mr. Thompson was handcuffed through the pass-through in the cell door – which allows officers to handcuff inmates without danger to the officers – and then brought to the opposite side of the room from his cell, where he sat on a bench.

31. C/O Gorman waited with Mr. Thompson at the bench while C/O Eltayeb, along with other officers, searched Mr. Thompson's cell for contraband.

32. The officers found items of nuisance contraband in Mr. Thompson's cell. The items of nuisance contraband were inspected by Sergaent Pierson and removed from the cell. Mr. Thompson was then led back towards his cell by C/O's Gorman and Eltayeb.

33. Prior to entering the cell, C/O Eltayeb instructed Mr. Thompson to face the wall next to his cell so that the officers could conduct a pat-search, which had been requested by Sergeant Pierson.

34. C/O Eltayeb began to conduct a pat-search of Mr. Thompson. During the pat-search, Mr. Thompson complained that the pat-search was not necessary. C/O Eltayeb continued the pat-search and Mr. Thompson spun away from the wall, and began charging towards C/O Eltayeb.

35. C/O Eltayeb responded to Mr. Thompson's charge by attempting to secure Mr. Thompson using counter-joint techniques. Although Mr. Thompson continued to resist, C/O Eltayeb was able to secure Mr. Thompson, and with the assistance of other officers, escort Mr. Thompson into his cell.

36. Once in the cell, C/O Eltayeb instructed Mr. Thompson to lay face down on the floor while the officers exited the cell.

37. After the officers exited the cell, Mr. Thompson was instructed to stand up and place his hands through the pass-through so that the handcuffs could be removed.

38. Mr. Thompson complied with that directive and the handcuffs were removed.

39. During the January 21st Incident, none of the participants, including Sergeant Pierson and C/O's Eltayeb and Gorman, ever punched or kicked Mr. Thompson and none of the officers slammed Mr. Thompson into the cell walls.

## Credibility of the Testimony

40. The court makes the following findings regarding credibility and the weight it has given to the testimony of certain witnesses:

    a. The trial was largely about witness credibility, as the parties presented contradictory versions of each incident.

b. The court finds defendants' version of the April 7th Incident credible and Mr. Thompson's version largely not credible. Among the factors that persuade the court of defendants' greater credibility are the following. The defendants' descriptions of the incident are largely consistent on the details but not so well-matched as to suggest they were testifying from a script. Additionally, the fact that numerous officers were treated for pepper spray and/or had to be decontaminated of pepper spray is consistent with a struggle where lack of control existed between the officers and Mr. Thompson and not consistent with a unilateral beating of Mr. Thompson. Lastly, Mr. Thompson's credibility was weakened because he stated that he could not remember what had happened the previous day during testimony, repeatedly argued with the court during trial proceedings, and admitted to taking various prescribed drugs for his temperament.

c. Likewise, and for similar reasons, the court finds defendants' version of the January 21st Incident credible and Mr. Thompson's version largely not credible. Again, the defendants' descriptions of the incident are largely consistent on the details but not so well-matched as to suggest they were testifying from a script. With respect to Mr. Thompson's credibility, it was again weakened because he stated that he could not remember what had happened the previous day during testimony, repeatedly argued with the court during trial proceedings, and admitted to taking various prescribed drugs for his

temperament. Additionally, Mr. Thompson referred to C/O Eltayeb by using derogatory language.[2]

## II. CONCLUSIONS OF LAW

1. The court has federal question jurisdiction to decide this action brought under the authority of 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

2. Venue is proper because the events giving rise to Mr. Thompson's claims occurred in King County, which is within the Western District of Washington. 28 U.S.C. §§ 84(a), 1391(b).

3. To prevail on a claim under 42 U.S.C. § 1983, Mr. Thompson must show (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

4. All defendants were acting under color of state law during both incidents.

5. The Eighth Amendment's prohibition of cruel and unusual punishment is violated when prison officials subject a prisoner to the use of excessive force. In evaluating such a claim, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). In making this determination, a court may evaluate the need for application of force, the relationship between that need and the amount of force used, the extent of any injury inflicted, the threat reasonably

---

[2] In Mr. Thompson's response to a disciplinary report pursuant to the January 21st Incident, he refers to C/O Eltayeb as a "Big Goon." (Dkt. #171 at 33.)

perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. *Id.* at 7; *LeMaire v. Maass*, 12 F.3d 1444, 1454 (9th Cir. 1993).

6. A prison official who fails to intervene to prevent an Eighth Amendment violation may be held liable under 42 U.S.C. § 1983. *See Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995).

7. The only defendants present during the April 7th Incident were Sergeant Ingersoll and C/O's Burach, Chu, and Eigo. During the April 7th Incident, Sergeant Ingersoll and C/O's Burach, Chu, and Eigo did not use excessive force under the circumstances. The force they used was only that necessary to subdue, restrain, and handcuff Mr. Thompson who had resisted lawful orders to stop and to submit to handcuffs.

8. During the April 7th Incident, Sergeant Ingersoll and C/O's Burach, Chu, and Eigo did not act maliciously and sadistically for the very purpose of causing harm to Mr. Thompson.

9. The only defendants present during the January 21st Incident were Sergeant Pierson and C/O's Eltayeb and Gorman. During the January 21st Incident, Sergeant Pierson and C/O's Eltayeb and Gorman did not use excessive force under the circumstances. The force they used was only that necessary to restrain Mr. Thompson and escort him back to his cell so that the officers could safely leave. The handcuffs were then removed from Mr. Thompson, without incident, through the pass-through of his cell. Mr. Thompson had defied lawful orders to submit to a pat-search after nuisance contraband was found in his cell during the shakedown.

10. During the January 21st Incident, Sergeant Pierson and C/O's Eltayeb and Gorman did not act maliciously and sadistically for the very purpose of causing harm to Mr. Thompson.

11. Because the force being used was not excessive in relation to the need for force, no defendant has liability for failing to intervene to stop the use of force.

12. Mr. Thompson did not establish by a preponderance of the evidence that any defendant violated his rights under the Eighth Amendment to be free from cruel and unusual punishment on April 7, 2005 or January 21, 2006.

13. Under the doctrine of qualified immunity, government officials are immune "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

14. All defendants are entitled to qualified immunity for their actions because their conduct did not violate Mr. Thompson's constitutional rights.

### III. CONCLUSION

Having made the above findings of fact and conclusions of law, the court now orders that plaintiff take nothing on his complaint. Judgment will be entered in Defendants' favor and against Plaintiff. The clerk shall close the file.

IT IS SO ORDERED.

Dated this 22nd day of December, 2011.

The Honorable James L. Robart
U.S. District Court Judge